IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIANE M. SCHWEIZER        :      CIVIL ACTION
                                        :
       v.                         :
                                        :
CITY OF PHILADELPHIA       :      17-5388

O P I N I O N

JACOB P. HART                            DATE:   07/09/2019
UNITED STATES MAGISTRATE JUDGE

In this action, Diane M. Schweizer, an employee of the City of Philadelphia, has sued the City of Philadelphia ("the City"), alleging discrimination on the basis of sex in violation of the Civil Rights Acts of 1964 (Title VII), and the Pennsylvania Human Rights Act. She alleges that she was subjected to a hostile work environment and retaliation.

The City has now filed a motion for summary judgment seeking dismissal of all counts. For the reasons set forth below, this motion will be granted.

I.     Standard for Summary Judgment

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In response, the non-moving party must present more than mere bare assertions, conclusory allegations, or suspicions to show the existence of a genuine issue. Jutrowski Township of Riverdale, 904 F.3d 280, 288 (3d Cir. 2018). It is not sufficient to reassert factually unsupported allegations contained in the pleadings. Anderson v. Liberty Lobby, 466 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, supra, at 325.

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. Anderson v. Liberty Lobby, supra at 255; Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358 , 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra, at 323.

II.     Factual Background

A.      Schweitzer's Employment History With the City

The parties agree that Schweizer is a woman who has been continually employed by the City of Philadelphia Fire Department ("Fire Department") since May, 1995, and remains employed there today. Defendant's Answer at ¶17, Defendant's Motion for Summary Judgment ("Motion"), at ¶172. She has a Bachelor of Science Degree in mathematics, with a minor in business administration, and a Masters' Degree in management and emergency medical services from Hahnemann University. Defendant's Motion at ¶1. She also studied for two semesters at the London School of Economics, and later obtained a certificate in Project Management. Id. at ¶4, Plaintiff's Response to Defendant's Motion for Summary Judgment ("Response") at ¶4.

The parties also agree that the Fire Department was, since its "earliest beginnings" a "male-dominated department." Motion at ¶13. The City maintains, however, that it prohibits discrimination or harassment on the basis of sex, and that the Fire Department has policies forbidding retaliating against an employee for having made a complaint of discrimination or harassment. Motion at ¶¶8-10. Schweizer admits that the City and the Fire Department "espouse" such policies. Response at ¶8-10.

Schweizer was first employed by the Fire Department as a paramedic. Motion at ¶16, Response at ¶16. She was promoted to the rank of Lieutenant in 1999, and was then promoted in 2004 to the rank of Captain. Motion at ¶17, Response at ¶17. In 2007, Schweizer became Battalion Chief in Emergency Services. Motion at ¶18. In 2014, she attained the rank of Deputy Commissioner of Administrative Services. Motion at ¶19, Response at ¶19. According to Schweizer, she was the first woman to hold the ranks of Captain, Battalion Chief, and Deputy Chief. Complaint at ¶21.

In June, 2014, Schweizer was appointed Deputy Commissioner of Administrative Services. Complaint at ¶23, Motion at ¶27. The parties agree that Schweizer was the first woman Deputy Commissioner at the Fire Department. Motion at ¶27. Her predecessor in this position was a man named David Beatrice, who was not a uniformed officer like Schweizer. Motion at ¶31, Response at ¶31.

According to Schweizer, she was selected for the position of Deputy Commissioner by then-Mayor of Philadelphia Michael Nutter, and his Chief of Staff, Everett Gillison. Complaint at ¶24, Deposition of Diane Schweizer, ("Schweizer Deposition") attached to the Motion as Exhibit 1, at 53-56. She has testified that Gillison asked her to meet with him in his office on May 1, 2014. Id. at 54. He asked her whether she would be interested in the position, telling her that he and Mayor Nutter "wanted to integrate women into the higher ranks of the Fire Department" and that she was more than qualified to hold the position of Deputy Commissioner of Administrative Services, based on her education and experience. Id. at 54-55. Schweizer told Gillison that she was interested in the position. Id.

Schweizer maintains that she was subjected to a hostile work environment in the position of Deputy Commissioner of Administrative Services.  Complaint at ¶26.  She alleges that she was repeatedly excluded from management meetings which were relevant to her work responsibilities.  Id. at 26(a).  She also points to the fact that she was the only Deputy Commissioner with no "command" function to perform during the Pope's September, 2015, visit to Philadelphia, and was excluded from the planning and operational meetings pertaining to this visit.  Id. at 26(f).

The following incidents are also said by Schweizer to have contributed to the hostile work environment she has alleged: (a) there was no locker room or bathroom in the building "for women of her rank", although there was a woman's restroom she could share with female staff; (b) she was assigned to share a one-desk office with David Beatrice for three months, whereas the three male Deputy Commissioners had offices of their own; (c) she had less support staff than the three male Deputy Commissioners; (d) she was given an old and damaged Ford Taurus, while the three male Deputy Commissioners had new Ford Expeditions; (e) she was "denied and given less recognition and respect at staff meetings, photo shoots and press conferences" than the male Deputy Commissioners were given.  Complaint at ¶12.

It is uncontested that Schweizer raised complaints with then-Commissioner Derrick Sawyer about much of this, including her exclusion from meetings, the lack of a women's locker room, her need to share an office, her level of staffing, and her vehicle.  Motion at ¶¶ 57, 68, 77, 85, 91.

Equally, it is undisputed that, in response to complaints from Schweizer, Commissioner Sawyer gave her his locker, in which she installed a lock.  Sawyer Deposition at 91; Deposition of Derrick Sawyer, attached to Motion as Exhibit 5, at 146.  Sawyer also gave Schweizer his

Ford Expedition when he obtained a new vehicle in November.  Schweizer Deposition at 106-7.

Further, Schweizer testified that David Beatrice was moved out of her office shortly after she

complained about the situation to Sawyer.  Id. at 88-89.

On February 17, 2016, at 10:03 p.m., Schweizer sent Sawyer an email stating:

Commissioner:

First, thank you for the opportunity to serve as Deputy Commissioner.  I was the first and only female to hold the position.  However, the time has come for me to leave.  I do not like the way I am being treated and undermined.  I can cite many examples, but I will only list a few:  1.  my role during the Papal visit (assigning a Deputy Commissioner to the EOC when my peers had roles as Incident Commands);  2.  the way we have to sit/stand (Car 2, 3, 4, and 5 are all equal rank yet I as Car 5 am always last);[1]  3.  I am the only Deputy Commissioner without an assistant/executive chief; and 4.  Car 3 disrespected me and has spoken inappropriately to me on several occasions, which was witnessed by others on the Executive team and yourself.

I have always given 100% and more.  I was responsible for all the hiring, reducing OT, applying for the SAFER grant, etc.  I make many decisions based on information I currently have.  In regards to Jeanette's promotion, I thought it was inappropriate to discuss it while in another meeting.  If given the opportunity to finish the explanation, I would have told you that the situation was in the process of being corrected.  What you do not know is that on Friday, after I obtained all the information, I asked Jeanette to come to my office and she refused.  For the record, the promotion was processed today.

Effective 02/29/16, (beginning of a pay period), I am resigning my position as Deputy Commissioner and will return to my Civil Service Rank.  Please advise of my shift and where to report on 02/29/16.

I have vacation time that I have to use and am requesting to use it next week to handle some personal issues.

Thank you.

Schweizer Email, attached to Motion as Exhibit 14.

---

[1] At that time, the Fire Department was organized by "Cars," each with its Deputy Commissioner.  The Fire Commissioner was designated as Car 1, Fire Operations was Car 2, Technical Services was Car 3, Emergency Medical Services was Car 4, and Administration, where Schweizer was Deputy Commissioner, was Car 5.

The second paragraph of this email refers to an incident which Schweizer testified at her deposition was the "final straw" in her decision to quit her job. Schweizer Deposition at 143. According to Schweizer, Sawyer turned to her in the middle of a meeting, earlier in the day on February 17, 2016, and ordered her to promote the secretary of one of the Fire Chiefs, even though she had explained to the Fire Chief that the promotion was only available to the individual if she left her job as his secretary and "went onto personnel." Id. at 144-5. She testified: "This continued behavior of these Chiefs going around me and going to Sawyer, it weakened me as a Deputy Commissioner in the Fire Department because people viewed me then that they could just go around me and then he would undo whatever it was that I was doing." Id. at 146.

Commissioner Sawyer did not respond to Schweizer's email. Sawyer Deposition at 126. On February 26, 2016, he issued a General Memorandum announcing that the Office of the Deputy Commissioner of Administrative Services would remain vacant until further notice, and that Schweizer would become the Fire Paramedic Deputy Chief for EMS Administration. General Memorandum No. 16-20, attached to Motion as Exhibit 15.

Schweizer argues that, at her new job, she "faced similar mistreatment and retaliation for her prior complaints of discrimination in her position as Deputy Chief for EMS Administration." Complaint at ¶32. In her Complaint, she specifies: (a) on her arrival at her new job location, there was no office available for her for two weeks; (b) she was not permitted to work compensatory time, unlike other Deputy Chiefs; (c) two male Battalion Chiefs who technically reported to her repeatedly contacted the Deputy Commissioner, bypassing her, and – when informed – the Deputy Commissioner did not put an end to this; (d) when the EMS unit was relocated in 2017, to the Fire Administration Building where she had previously worked as a

Deputy Commissioner, she was again once again compelled to share an office for a month, this time with Chief Deputy Loesch; (e) there was still no women's locker room in the Fire Administration Building in 2017; and (f) her secretary and her Captain of EMS Complaints were transferred without any discussion with her.  Complaint at ¶33, and Schweizer Deposition at 161, 177, 187, 189.

Upon one occasion when Schweizer was sharing an office, she opened the office door to a conversation between Chief Loesch and Deputy Commissioner Wilson about "how the higher you go up in rank, the more complex it gets between the sheets."  Schweizer Deposition at 182. Schweizer quickly left the office, and when she returned a few minutes later, the office door was locked.  Id.

On May 16, 2016, Derrick Sawyer was replaced as Fire Commissioner by Adam Thiel. Thiel Deposition, attached to Motion as Exhibit 6, at 5.  On June 9, 2016, Schweizer sent the following email to Commissioner Thiel:

Commissioner:

It was a pleasure meeting you last week and welcome to Philadelphia.

I stepped down from my previous position as Deputy Commissioner due to a hostile work environment.  However, since I returned to my rank of Deputy Chief, nothing has changed.  I am requesting a meeting with you to discuss my current job duties and working conditions.

Thank you for your time.

Diane Schweizer
Deputy Chief.

Schweizer Email of June 9, 2016, attached to Motion as Exhibit 16.

Commissioner Thiel responded to Schweizer by e-mail on June 10, 2016. Adam Thiel Email of June 10, 2016, attached to Defendants' Motion as Exhibit 17. He offered to meet with Schweizer at noon the same day. Id. Schweizer testified at her deposition that, at that meeting, she told Commissioner Thiel about her inability to earn "comp time", and about "the Chiefs going around" her. Schweizer Deposition at 202.

When asked: "Did you mention that you were being subjected to a hostile work environment based on your gender?" Schweizer responded: "No." Id. at 202-3. When asked: "Did you say anything to give him an inkling that you were complaining that you were being mistreated because you were a female?" she also replied: "No." Id. at 203. Nor did she tell him that she believed that she was being subject to retaliation. Id. at 203-4.

According to Schweizer, Commissioner Thiel essentially pleaded ignorance of the facts surrounding her complaints based on his only having been in his job for 26 days. Id. at 202. Thiel, however, testified at his deposition that, in response to Schweizer's complaint about the behavior of her direct reports, he "reminded her that they were her – her direct reports and if there was a performance issue, that she should manage that and document it as needed." Deposition of Adam Thiel, attached to the City's Motion as Exhibit 6 at 54.

Commissioner Thiel also testified that Schweizer had requested to be more involved with the meeting of the Democratic National Convention that took place in Philadelphia. Id. at 50. He stated: "And I verbally directed the Deputy Commissioner for EMS, Jeremiah Laster, to include Chief Schweizer in that event." Id.

Regarding Schweizer's complaint that she could not work comp time, Thiel testified:

Another change that – or another item she talked about was the fact that as the sole – at that time the sole EMS Deputy Chief, that she didn't have a partner with whom to trade compensatory time. You know I took that issue as potentially a broader issue and our organizational restricting, several additional EMS – actually three EMS Deputy Chiefs

were created and assigned to rotating shift schedule, again, for objective reasons, technical reasons. But my sense was that would satisfy that concern that she also had.

Id. at 51-2. Schweizer testified that after the restructuring, which went into effect on September 21, 2016, she was able to work comp time. Schweizer deposition at 214.

Several days before this, on September 14, 2016, Schweizer filed a Charge of Discrimination against the City with the United States Equal Opportunity Commission, averring that she had been subjected to a gender-based hostile work environment and retaliation. EEOC Charge, attached to City's Motion as Exhibit 27. The complaint was cross-filed with the Pennsylvania Human Relations Committee. Complaint at ¶12.

Schweizer maintains that she was subject to discrimination and retaliation in that she was not selected for two positions for which she applied. In January, 2017, Commissioner Thiel selected four new Deputy Commissioners. Thiel Memorandum of January 30, 2017, attached to the City's Motion as Exhibit 26. Schweizer was not offered one of the Deputy Commissioner positions, although she applied and interviewed for the job. Complaint at ¶34.

Schweizer has not contested evidence provided by the City that the interviews for the Deputy Commissioner positions were conducted by a three-person external panel which included one woman, as well as Commissioner Thiel and his Chief of Staff, Tara Mohr, who was also a woman. Affidavit of Tara Mohr, attached to the City's Motion as Exhibit 22. All job candidates were asked the same five interview questions. Id. at ¶8. The independent panel members did not review the candidate's objective qualifications; instead, they offered comments about each candidate after the interview, assessing whether the candidate was ready for the position. Id. at ¶9. Notes taken by the panel members show that no member indicated that Schweizer was ready for the position. Exhibits 24 and 25 to the City's Motion.

In April, 2017, Schweizer applied for the position of Assistant Fire Chief. Schweizer Deposition at 261. According to the memorandum circulated regarding this position, it required two years of experience as a Fire Deputy Chief. Memorandum of April 10, 2017, attached to City's Motion as Exhibit 30. Schweizer was not permitted to take the examination for this position because she did not have any experience as a Fire Deputy Chief. Disapproval Notice, attached to City's Motion as Exhibit 31.

Also in April, 2017, Commissioner Thiel eliminated the position of Deputy Chief for EMS Administration, and made Schweizer one of four newly created Deputy Chiefs of EMS Operations. Affidavit of Tara Mohr at ¶12, Complaint at ¶41. This is the position Schweizer held as of the date of her deposition. Schweizer Deposition at 281.

Schweizer was ultimately issued a "right to sue" letter by the Department of Justice. Id. at ¶13. On December 1, 2017, she filed a Complaint in the present litigation.

B.    The Evidence

As noted above, the City's right to summary judgment depends on the state of the evidence at the time the motion is filed. If the evidence, construed in all respects in favor of Schweizer, creates an issue of material fact as to all of the elements as to which she will bear the burden of proof at trial, summary judgment must be denied.

Schweizer was deposed by the City on March 19, 2019, for approximately six hours. Schweizer Deposition at 1-293. In her response to the City's motion, Schweizer has heavily relied upon her own deposition testimony. Notably, however, Schweizer was consistently unable to give reasons why she believed that the things that occurred to her were part of a gender-based hostile work environment, or constituted retaliation.

For example, Schweizer was asked: "Do you have any reason, any facts as you sit here today, to dispute that these issues with respect to staff [i.e., that the three other Deputy Commissioners, who were male, had more staff] were not based on the Car that the individual Deputy Commissioner was assigned to?" Schweizer Deposition at 103. She responded: "I don't know what they're based on." Id.

As to the assignment of vehicles, the following exchange took place:

Q.    And what facts do you have as you sit here today that you were assigned the … the Taurus because you were a female?

A.    Because they could have given me another vehicle. They could have. Why not give the Ford Taurus to Car 4?

Q.    My question is what facts do you have as you sit here today to establish that you were given the Ford Taurus that David Beatrice [her predecessor] had because you were a female?

A.    Because I'm a female and that car was given to me.

Id. at 109-110.

Again, regarding Schweizer's allegation that she was excluded from meetings that were relevant to her job duties, she conceded that she had no evidence of any specific meeting from which she was excluded. Id. at 84. She agreed that she had read all the documents produced by the City regarding meetings, but when asked "Did you see any meeting – any email documentation regarding meetings about promotions that you weren't included in?" , she responded: "No." Id. at 85. In response to the same question regarding meetings about purchasing equipment, she stated: "No, but I will say just because I didn't find it in an email doesn't mean that there wasn't meetings." Id. at 85-6.

As to Chief Bossert and Chief Touchstone, the two subordinates who bypassed her in her role as Deputy Chief for EMS Administration, sending emails directly to her supervisor, Deputy Commissioner Laster, the following interchange took place:

> Q.      Did you attribute to anyone that Bossert and Touchstone were omitting you from emails because you were a female?
>
> A.      No.
>
> Q.      And did you complain to anyone that they were omitting you from these emails because you complained about discrimination?
>
> A.      No.
>
> Q.      And do you have any facts to support that they were doing it for either of these reasons?
>
> A.      No.

Id. at 175.

Deposing counsel asked Schweizer a second time whether she had any facts "as you sit here today" to support a claim that Bossert and Touchstone "ostracized or marginalized" her because she was a woman, or  because she had complained about discrimination.  Id. at 176. Schweizer again responded "no" to both questions.  Id.

Schweizer was asked whether she had any evidence to support a claim that her secretary was transferred without notice to her because she was a female. Id. at 187-8.  She replied: "none."  Id. at 88.  She added that she did, however, believe it was done because she was a woman:  "Because they just thought they could come and take my employees and not have a discussion with me."  Id.  Similarly, regarding the transfer of the Captain of EMS Complaints, Schweizer testified:  "Because you don't just take somebody's employees without having a conversation with them.  You don't reassign them.  I've never known that to happen to anybody else, and I'm female."  Id. at 189-190.

As above, Schweizer has argued that she was "qualified to perform the duties" of all four of the Deputy Commissioner positions for which she was not selected.  Complaint at ¶34-36. However, when she was asked whether she had any facts to support a claim that the panel made its decision about each successful applicant "because he was a male and you were a female" she replied "No."  Id. at 241, 244, 245 and 248.  Similarly, she had no facts to support a claim that any of these decisions was made in retaliation for her complaining about discrimination.  Id.

Regarding the Assistant Fire Chief position for which Schweizer was not allowed to apply, her testimony was the following:

> Q.      So everybody that didn't have Fire Deputy Chief experience was excluded, not just you, correct?
>
> A.      Yes.
>
> Q.      Is it your testimony that they created this job description specifically to exclude you from the position?
>
> A.      Yes.
>
> Q.      You believe that?
>
> A.      Yes, I do.
>
> Q.      What facts do you have to believe that the Fire Department created the requirements for Assistant Fire Chief position to specifically … exclude you?
>
> A.      None.
>
> Q.      What facts?
>
> A.      None.

Id. 258-9.  She also testified that she was not aware of anyone else that was permitted to apply for the position without the required experience.  Id. at 262.

Aside from relying upon her own testimony (and Interrogatory responses), Schweizer has attached several exhibits to her Response which indicate that the Fire Department has been subject to claims of discrimination based on gender aside from her own. Schweizer's Exhibits A, B and C. These exhibits support the undisputed allegation that the Fire Department has traditionally been a "male dominated workplace." However, the matter contained in the exhibits pertains to fraternization and sexual behavior between Fire Department Employees, and incidents of sexual assault, none of which Schweizer has alleged in this case.

III.     Discussion

A.     Hostile Work Environment

Title VII prohibits behavior based on sex which is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). To prevail on a hostile work environment claim, a plaintiff must demonstrate five things: (1) that she suffered intentional discrimination because of her protected status; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017).

The determination as to whether a work atmosphere is hostile requires consideration of such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

1.     <u>Intentional Discrimination on the Basis of Sex</u>

Initially, Schweizer has not succeeded in showing that she suffered intentional discrimination because of her protected status. In other words, she has not demonstrated a link between her treatment by the Fire Department and the fact that she is a woman.

There are very few, if any, material disputes in this case about the facts that occurred. The question, therefore, is whether those facts could be reasonably interpreted as showing gender-based discrimination. Schweizer points out that this depends on a consideration of the whole record. She cites <u>Andrews v. City of Philadelphia</u>, where the Court of Appeals for the Third Circuit wrote: "What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents." 895 F.2d 1469, 1484 (3d Cir. 1990) (superseded by statute on other grounds).

With one exception which is discussed below, Schweizer has not alleged any incident in which her gender, or women in general, were referred to in any way, whether directly or indirectly. This, however, is not fatal in itself to her hostile work environment claim. Thirty years ago, the Court of Appeals for the Third Circuit recognized that not every hostile environment involves explicit language:

> Though they still happen, the instances in which employers and employees openly use derogatory epithets to refer to fellow employees appear to be declining. Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms. It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior. In other words. While discriminatory conduct persists, violators have learned not to leave the proverbial "smoking gun" behind. As one court has recognized, "[d]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it." <u>Riordan v. Kempiners</u>, 831 F.2d 690, 697 (7th Cir. 1987). But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged. "Title VII tolerates no racial discrimination, subtle or otherwise."

McDonnell Douglas Corp. v. Green, 411 U.S. 801, 93 S. Ct. 1817, 1824, 36 L. Ed.2d 668 (1973).

Aman v. Court Furniture Rental Corp., 85 F.3d 1074, 1081-2 (3d Cir. 1996).

Thus, a court deciding a motion for summary judgment in a discrimination case must "examine the possibility that the defendants' 'management decisions' masked discriminatory intent":  "The advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment."  Cardenas v. Massey, 269 F.3d 251, 261-2 (3d Cir. 2001).

Nevertheless, there must be evidence from which a jury could reasonably conclude that the atmosphere to which Schweizer was exposed at the Fire Department was "pervaded by *discriminatory* intimidation, ridicule and insult."  Aman, supra, at 1082, citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  (Emphasis supplied).

At her deposition, Schweizer admitted time and time again that she had no facts to support her belief that her gender underlay the treatment of which she complained.  She may indeed have developed a hunch that she would have been treated better if she had been a man, but this is not enough to survive summary judgment.  As noted above, a party's bare assertions and her suspicions do not create a genuine issue of fact.  Jutrowski Township of Riverdale, supra, at 904 F.3d 288, and see Velez v. QVC, Inc., 227 F. Supp.2d 384, 415 at n. 29 (E.D. Pa. 2002):  ("A plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn").

Notably, in both <u>Andrews</u> and <u>Cardenas</u>, where the courts decided that facially neutral decisions could support a hostile work environment claim, the neutral behavior was evaluated by the court in the context of more explicit behavior. In <u>Andrews</u>, the female police officer plaintiffs were exposed to a great quantity of foul language specifically referring to women, and often to the plaintiffs themselves, as well as male-oriented pornography, sometimes placed on their desks, along with the "many close calls and uncertainties" which the court held must be considered. Similarly, in <u>Cardenas</u>, the ostensibly neutral "management decisions" included consistently giving minority workers lower job evaluations and assigning them to a unit with a minority manager, "in addition to oral and written ethnic slurs." 269 F.3d 251, 262. There was, therefore, a strong basis for inferring gender-based discrimination even in the less explicit behavior.

Schweizer has not shown anything of that sort. Although she has provided reports which show that the Fire Department has been involved in serious gender-related misconduct, the facts which are the subject of those reports are so dissimilar to the facts of her case that they can not support a finding of discrimination here.

Further, the incident where Schweizer entered the office she shared with a male co-worker to find him holding a conversation with another male about how "the higher you go in rank the more complicated it gets between the sheets" is not, in itself, strongly indicative of discrimination. The conversation was not held in a public forum, it did not involve foul language or explicit descriptions, nor did it clearly rely on a degrading or stereotyped view of women. Standing alone, it is not enough to transform into gender-based discrimination the extremely dissimilar events to which Schweizer otherwise points.

2.      Severe or Pervasive Discrimination

Even if I had not concluded that Schweizer cannot show that the behavior of which she complains was discriminatory on a basis prohibited by Title VII, I would grant summary judgment against her on her hostile work environment counts because she has not provided evidence that the behavior was severe or pervasive.

Certainly, Schweizer has not pointed to an event so severe that it relieves her of the need to show pervasive discrimination.  In Castleberry, supra, the plaintiffs alleged that their supervisor used an extremely offensive racial epithet in front of them and other employees, while threatening to fire the plaintiffs.  863 F.3d at 266.  The Court of Appeals for the Third Circuit found that this constituted severe enough conduct that it could be found to create a hostile work environment.  In the context of sexual discrimination, one court has said:  "For example, a rape, or an obscene and humiliating verbal tirade that undermines the victim's authority in the workplace" could be considered a sufficiently severe single event to create a hostile work environment.  Mathirampuzha v. Potter, 548 F.3d 70, 79 (2d Cir. 2008).

The determination as to whether Schweizer has provided evidence of pervasive discrimination sufficient to show a hostile work environment is complicated by the fact that she is essentially arguing that she was subject to less favorable employment conditions and decisions than were her male coworkers; inferior work assignments, exclusion from "assignments and opportunities", inferior office conditions, and inferior recognition at official functions.  Complaint at ¶26.  Yet Schweizer has not pled a claim of disparate treatment, nor has she come forward with argument are necessary to support such a claim, such as discussing a comparator, or showing pretext on the part of the Fire Department for its asserted reasons for its actions.

Although the issue has not been addressed by the Court of Appeals for the Third Circuit, several courts in this Circuit have disallowed hostile work environment claims which are really recast claims of disparate treatment:

> The dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address. … As the Supreme Court discussed [in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986)] hostile work environment claims provide a means of redress under Title VII for discrimination that does not take the more traditional form of a tangible or economic loss but rather for discrimination that contaminates the psychological aspects of the workplace to the degree that conditions of the workplace are altered. … Although the assignment of a hostile supervisor and false accusations by that supervisor could be classified as the kind of "discriminatory intimidation, ridicule and insult" addressed by a hostile work environment claim, 477 U.S. at 65, the more favorable treatment of men with respect to troop and shift assignments and transfer opportunities could not.

Lampkins v. Mitra QSR KNE, LLC, Civ. A. No. 16-647, 2019 WL 2357444 at *10-11 (D. Del. June 4, 2019), citing Parker v. State of Del. Dep't of Public Safety, 11 F. Supp.2d 467, 475-6 (D. Del. 1998);

Other courts have agreed with Parker and Lampkins. Busch v. Oswayo Valley School District, Civ. A. No. 15-239, 2016 WL 5394085 at *10 (W.D. Pa. Sep. 27, 2016); Helvy v. Allegheny County, Civ. A. No. 14-1686, 2015 WL 672262 (W.D. Pa. Feb. 17, 2015); and see Haqq v. Pennsylvania Dept. of Public Welfare, Civ. A. No. 09-42, 2010 WL 1253452 at *9 ftn. 9 (E.D. Pa. Mar. 23, 2010), calling Parker "well reasoned" in this regard.

Even if a hostile work environment case can be based on differential treatment, the conduct upon which Schweizer relies is not sufficient. She has not shown pervasive conduct which contaminated the psychological aspects of her workplace. Many things to which she has pointed were, in fact, corrected at her insistence, such as the lack of a locker room, an inadequate car, and the requirement that she share an office. Complaint at ¶26b, c and e. Further, the fact

that Schweizer had to sit and stand last in public appearances appears to be incidental to her assignment to Car 5.  Complaint at ¶26g.

Even the Fire Department's alleged failure to assign Schweizer work as substantive as that of the male Deputy Commissioners – which could conceivably have formed part of a disparate treatment claim – did not result in any intimidation, insult or ridicule.  Schweizer has not alleged an atmosphere which was physically threatening or humiliating, and she has not shown that her work environment unreasonably interfered with her work performance.

Similar claims relating to work conditions and assignments were found to be inadequate to state a claim for a hostile work environment in Lebofsky v. City of Philadelphia, Civ. A. No. 06-5106, 2009 WL 1507581 (E.D. Pa. May 29, 2009).  There, the court wrote:  "While [Plaintiff's] feelings may have been hurt, or his ego bruised, and he was certainly unhappy that he had been passed over for two promotions, there is no evidence that Lebofsky suffered any intimidation, ridicule, or insult; that his work product was adversely affected; or that his employment … was in jeopardy."  2009 WL at *18.  Like Lebofsky, if Schweizer has shown any discrimination (and I have found she has not), she has not shown that it was severe or pervasive.

B.    Retaliation

A plaintiff seeking to establish a *prima facie* case of retaliation under Title VII must show (1) that she engaged in a protected activity, which can include informal protests of discriminatory employment practices; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the protected activity and the adverse action.  Moore v. Secretary U.S. Department of Homeland Security, 718 Fed. Appx. 164, 166 (3d Cir. 2017), citing Daniels v. School District of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015).

Although "protected activity" extends beyond formal complaints filed with the EEOC or the PHRC, and can include informal protests such as making complaints to management, the complaints must be specific enough to notify management of the particular type of discrimination at issue. Mikell v. Marriott International, Inc., 789 F. Supp.2d 607, 618-9 (E.D. Pa. 2011), citing Sanchez v. SunGard Availability Services, LP, 362 F. Appx. 283, 288 (3d Cir. 2010). A general complaint of unfair treatment is insufficient to establish protected activity under Title VII. Curay-Cramer v. Ursuline Academy of Wilmington, 450 F.3d 130, 135 (3d Cir. 2006).

Unless direct evidence of retaliation can be shown, a Title VII claim of retaliation is analyzed under the burden-shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006). Under this analysis, once a plaintiff has made out a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. McDonnell Douglas, supra at 411 U.S. 802. In this Circuit, if the employer is able to do this, the burden of production rebounds to the plaintiff, who must show that the employer's explanation is pretextual, either by discrediting that explanation, or by showing that retaliation was more likely than not a motivating and determining factor. Fuentes v. Perskie, 32 F.3d 759, 763-4 (3d Cir. 1994).

Schweizer has alleged that she "complained about her mistreatment" to Commissioners Sawyer and Thiel, and to "others in the City, including its Director of Human Resources" as well as "Members of the City Solicitor's Office", but that they "did nothing to remedy the hostile work environment to which she was subjected." Complaint at ¶¶27-29. However, the evidence does not show protected activity before the filing of Schweizer's EEOC complaint.

At her deposition, Schweizer conceded that – although she did complain about her treatment in a number of respects – she did not address concerns to the City about the issues which she now complains were the product of gender discrimination prior to or at the time of her resignation as Deputy Commissioner.  Schweizer Deposition at 133-134, 136.  She did not file a complaint with William Twardzik of the City's Office of Human Resources.  Id. at 137.

Schweizer also conceded that her emailed letter of resignation to Commissioner Sawyer did not mention gender discrimination.  Id. at 138.  It is evident from the language of that letter, which is set forth above, that this is the case.

As is also noted above, in Schweizer's June 9, 2016, email to Commissioner Thiel asking for a meeting, she wrote that she stepped down as Deputy Commissioner "due to a hostile work environment" and that nothing had changed.  The phrase "hostile work environment" might be considered recognizable as coming from the world of Title VII law.  Nevertheless, Schweizer did not mention Title VII, or gender discrimination.  Nor did she mention any specific incident.

Further, regarding Schweizer's June 10, 2016, meeting with Commissioner Theil, the following interchange occurred at her deposition:

Q. Did you mention discrimination during that meeting?

A. No.

Q. Did you mention that you were being subjected to a hostile work environment based on your gender?

A. No.

…

Q. Did you attribute to him – did you say anything to give him an inkling that you were complaining that you were being mistreated because you were a female?

A. No.

Q.   Okay.  Did you say anything to Commissioner Thiel to give him any indication that you believed that you were retaliating – being retaliated against because you were a female?

A.   No.

Q.   Did you make any statement to Commissioner Thiel that you believed that you were being retaliated against because you made prior complaints of discrimination?

A.   No.

Id. at 202-3.

It appears, therefore, that Schweizer did not engage in any protected activity until she filed her complaint with the EEOC on September 14, 2016.  Events which occurred after that date which Schweizer has called adverse actions attributable to retaliation include: (1) being bypassed by her subordinates, Chiefs Bossert and Touchstone; (2) the rejection of her application to become a Deputy Commissioner in January, 2017; and (3) the rejection of her application to test for the position of Assistant Fire Chief.  Complaint at ¶¶33-39.  Schweizer's inability to work compensatory time continued for only a short time after she filed her EEOC complaint, so it would not be possible to attribute that policy to retaliation.

Crucially, as noted above, Schweizer admitted at her deposition that she could point to no evidence in support of her allegation that the above alleged adverse actions were the result of retaliation.  Schweizer deposition at 75 (Bossert and Touchstone's circumvention of her); 241-248 (the Deputy Commissioner selections); 258-9 (the Assistant Fire Chief position).  With no such evidence – even based on inference – Schweizer would not be able to demonstrate a causal connection between these actions and her protected activity.

C.    The PHRA Claims

In the above discussion, I have referred only to Schweizer's claims under Title VII. However, the analysis of a claim for hostile work environment under the PHRA is identical to that under Title VII. Weston v. Pennsylvania, 251 F.3d 420, 425 n. 3 (3d Cir. 2001) (overruled on another basis). The same is true for claims of retaliation under the PHRA. Fogelman v. Mercy Hospital, Inc., 283 F.3d 561, 567-8 (3d Cir. 2002). Accordingly, summary judgment is properly granted against Schweizer on her PHRA claims as well as her Title VII claims.

IV.    Conclusion

For the foregoing reasons, I will grant the City's Motion for Summary Judgment against Schweizer on all counts, and order that the case be dismissed.

BY THE COURT:

/s/ Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE